BRIAN AND PAMELA UPHUS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ROGER W. AND LOIS J. WALKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Uphus v. Commissioner
Docket Nos. 4281-93, 4493-93
United States Tax Court
T.C. Memo 1994-71; 1994 Tax Ct. Memo LEXIS 72; 67 T.C.M. (CCH) 2229; February 23, 1994, Filed *72 Decision will be entered under Rule 155. For petitioners: Thomas Copeland. For respondent: Jack Forsberg. DINAN
DINAN
MEMORANDUM OPINION DINAN, Special Trial Judge: These cases were heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1] After trial, these cases were consolidated for briefing and opinion. Respondent determined a deficiency in petitioners Brian and Pamela Uphus' Federal income tax for the year 1989 in the amount of $ 321. Respondent determined a deficiency in petitioners Roger W. and Lois J. Walker's Federal income tax for the year 1989 in the amount of $ 715. Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by this reference. Petitioners resided in St. Paul, Minnesota, at the time *73 they filed their respective petitions in these cases. Petitioners in each case timely filed joint Federal income tax returns for the year 1989. The issue for decision is, pursuant to section 280A(c)(4), which areas of petitioners' residences are areas "used on a regular basis" in petitioners' trade or business of providing day care for children? Petitioners Brian and Pamela Uphus (hereinafter the Uphuses) lived on Fremont Avenue East in St. Paul, Minnesota (hereinafter the Fremont Avenue property) in 1989. Petitioner Pamela Uphus (hereinafter Mrs. Uphus) is in the trade or business of providing day care for children. Mrs. Uphus was a State-licensed day-care provider for children from 1988 to 1993. During 1989, although the number of children Mrs. Uphus provided day care for fluctuated during the week, she generally cared for seven children: five children 5 days a week and two children 3 days a week. Mrs. Uphus did not have any children of her own. In 1989, Mrs. Uphus operated her day-care business 2,952 hours; this included home preparation and cleanup time. Throughout 1989, the Fremont Avenue property was used on a regular basis in Mrs. Uphus' trade or business of providing *74 day care for children. The Fremont Avenue property includes a rather small one-story house (hereinafter the Uphus house) with a finished basement and a detached garage (hereinafter the Uphus garage) which is located to the side of the Uphus house. Behind the Uphus house is a fenced-in grassy yard that is used during the day as a play area for the day-care children. The Uphus house has a total of 1,723 square feet, 927 square feet on the first floor and 796 square feet in the basement. [2] The garage is a 528-square-foot lighted, unheated, 1-1/2-car garage. No area of the Uphus house is used exclusively for Mrs. Uphus' trade or business of providing day *75 care. All areas of the first floor and the basement play room, play area, bathroom, and office were used on a regular basis in Mrs. Uphus' trade or business of providing day care. The issue for decision relates to respondent's determination that the garage and basement laundry area and storage area were not used on a regular basis in her day-care business. Although the children were not prohibited from entering the garage, the laundry area, or the storage area, unsupervised playing in these areas was not generally allowed. The garage was used by Mrs. Uphus to park her car and store both day-care and Uphus personal items. Mr. Uphus' car was always parked on the street. The garage contained the majority of the outside day-care play items; i.e., scooter bikes, sandbox toys, wagons, a movable cardboard basketball hoop, a slide, etc. The garage was also used to store lawn chairs, lawn-care materials, tools, a snowblower, bicycles, and miscellaneous other items that were stored in the rafters. During an average day, Mrs. Uphus and the older children were constantly entering the garage to retrieve and return the outdoor play items; the young children were not allowed to enter the *76 garage unsupervised. A few times a month, when Mrs. Uphus took the day-care children on field trips, i.e., to the library, zoo, and grocery store, the garage was used to access her car. During the winter, the Uphuses used the snowblower to clear their home entrance for the day-care children, and in the summer and spring, the Uphuses used the lawn-care materials to maintain the yard. Often, Mrs. Uphus used the tools in the garage to fix the bikes or other play items. The basement contained, among other areas, the laundry area and the storage area. As with the garage, each of these areas was generally off limits to the day-care children for playing, unless supervised by Mrs. Uphus. However, as with the garage, it was common -- if not an everyday occurrence -- for Mrs. Uphus to have to retrieve children from these areas. Mrs. Uphus was in and out of the laundry area and storage area constantly each week. On average, she did one or sometimes two loads of laundry per day in connection with her day-care business and about the same number of loads of personal laundry. Periodically during the day, Mrs. Uphus entered the laundry area to load or unload laundry from the washer or dryer, *77 fold the laundry, or put the laundry away. The laundry room also contained, among other appliances, an extra freezer. The Uphuses purchased the extra freezer so that they could store the food that they purchased to feed the day-care children. On average, Mrs. Uphus entered the laundry area once a day specifically to get food from the freezer for the day-care children. The storage area was merely an open area located next to the laundry. Mrs. Uphus used the storage area to store the bulk of the indoor play items, day-care items not currently in use, and other miscellaneous business and nonbusiness items. For example, the storage area contained the baby cribs when they were not needed, toys that the children were either too old or too young to play with, and extra towels, linens, and the like. On average, the children entered the storage area two or three times per day. Mrs. Uphus entered the area considerably more times each day. During 1989, petitioners Roger W. and Lois J. Walker (hereinafter the Walkers) lived on Laurel Avenue in St. Paul, Minnesota (hereinafter the Laurel Avenue property). Petitioner Lois Walker (hereinafter Mrs. Walker) is in the trade or business of *78 providing day care for children. Mrs. Walker's situation is factually similar to that of Mrs. Uphus. During 1989, Mrs. Walker was a State-licensed day-care provider for children. During 1989, Mrs. Walker on average provided day care for seven children: five children 5 days a week and two children 3 days a week. Mrs. Walker also cared for her own 3 children during the day. The day-care children ranged in age from 2 years to 9 years. Her children ranged in age from 2 years to 8 years. Mrs. Walker operated her day-care business a total of 3,002.5 hours in 1989, including preparation and clean-up time. Throughout 1989, the Laurel Avenue property was used on a regular basis in Mrs. Walker's trade or business of providing day care. The Laurel Avenue property is a rather small, two-story house (hereinafter the Walker house) with a finished, heated basement, and a detached garage/playhouse (hereinafter the Walker garage/playhouse) that is located behind the Walker house. The Walker garage/playhouse is separated from the Walker house by a fenced-in grassy yard. Both the yard and play house are used during the day as play areas. The Walker house has a total of 1,882 square feet: *79 659 square feet on the second floor, 659 square feet on the first floor, and 564 square feet in the basement. [3] The garage/playhouse is a two-story structure consisting of a 140-square-foot upper level that is used as a play area, and a 400-square-foot lower level that is a two-car garage. The upper level of the Walker garage/playhouse (hereinafter Walker playhouse) is on the same level as the backyard of the Walker house. The garage portion of the Walker garage/playhouse (hereinafter Walker garage) is on the same level as the alley. The yard is approximately 10 feet higher than the alley. *80 No area of the Walker house is used exclusively for Mrs. Walker's trade or business of providing day care for children. All areas of the first floor, second floor, and the Walker playhouse were used on a regular basis in Mrs. Walker's trade or business of providing day care. The issue for decision relates to respondent's determination that the Walker garage and the basement (bathroom, laundry area, and storage area) were not used on a regular basis in her day-care business. The Walker garage was rarely used in the day-care business. The children were prohibited from playing in the garage. The Walker garage generally contained Mrs. Walker's car and miscellaneous personal items of the Walkers. Mr. Walker's car was parked on the street. On occasion, one of the day-care children would leave a bicycle in the garage during the day. A few times a week, Mrs. Walker used the garage to access her car when she took the children on field trips, usually to the library, park, or zoo. Four days a week, the day-care children used the garage to access Mrs. Walker's car because she took the day-care children with her when she drove her child to preschool. The basement of the Walker house *81 contained three areas: the bathroom, the laundry room, and the storage room. Generally, the children were not allowed to play in or enter the basement unsupervised. The basement did not meet State requirements for spaces that can be used by day-care children. However, as with Mrs. Uphus, Mrs. Walker's rule barring the children from the basement was frequently ignored. With 10 children to care for, 7 of whom were day-care children, the laundry room was frequently used. During the week, Mrs. Walker was repeatedly entering the laundry room to load or unload the washer or dryer, fold the laundry, or put the laundry away. On average, Mrs. Walker, in connection with her day-care business, did approximately two to three loads of laundry a week and about 10 loads of personal laundry. The storage room and the laundry room contained the majority of the day-care play items. During the day, Mrs. Walker or the day-care children were constantly entering the rooms to get or return play items. Additionally, once a month, petitioner, pursuant to State regulations, conducted storm drills in the basement. The basement bathroom was one of only two bathrooms in the Walker house; the other bathroom *82 was on the second floor. The basement bathroom, although not the primary bathroom -- Mrs. Walker preferred that the children use the second-floor bathroom -- was used at least once per day. Petitioners bear the burden of proving entitlement to all deductions claimed. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 280A provides in pertinent part as follows: (a) General Rule. -- Except as otherwise provided in this section, in the case of a taxpayer who is an individual * * *, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence. * * * (c) Exceptions for Certain Business or Rental Use; Limitation on Deductions for Such Use. -- * * * (4) Use in providing day care services. -- (A) In General. -- Subsection (a) shall not apply to any item to the extent that such item is allocable to the use of any portion of the dwelling unit on a regular basis in the taxpayers trade or business of providing day care for children * * *. [Emphasis added.] (B) Licensing, etc. requirement. -- Subparagraph (A) shall *83 apply to items accruing for a period only if the owner or operator of the trade or business referred to in subparagraph (A) -- (i) has applied for (and such application has not been rejected), (ii) has been granted (and such granting has not been revoked), or (iii) is exempt from having, a license, certification, registration, or approval as a day care center * * * under the provisions of any applicable State law. * * *
To compute the deduction allowable under section 280A(c)(4), the total cost incurred with respect to the residence is multiplied by two fractions. Neilson v. Commissioner, 94 T.C. 1, 4, 9-10 (1990); S. Rept. 95-66, 95th Cong., 1st Sess. 1, 91 (1977), 1977-1 C.B. 469, 499. [4] The first fraction, space allocation, is the square footage of the residence that is used on a regular basis in furnishing day-care services divided by the total square footage of the residence. Sec. 1.280A-2(i)(3), Proposed Income Tax Regs., 45 Fed. Reg. 52404 (Aug. 7, 1980), as amended 48 Fed. Reg. 33320 (July 21, 1983). The second fraction, time allocation, is the number *84 of hours that the day-care business is operated during the year divided by total hours in the year. [5]Neilson v. Commissioner, supra at 9-10; sec. 1.280A-2(i)(4), Proposed Income Tax Regs., supra. In these cases, there is no dispute between the parties as to the total expenses incurred by petitioners in connection with their residences, the square footage of petitioners' residences, [6] or the hours the day care was operated. The only issue in dispute is which areas are areas "used on a regular basis" under section 280A(c)(4) *85 -- the numerator of the space allocation fraction. We must, therefore, determine whether petitioners used each of the areas or rooms in question on a "regular basis". The determination of whether the taxpayer has used a portion of the dwelling on a regular basis is made in light of all the facts and circumstances. Sec. 1.280A-2(f), Proposed Income Tax Regs., 45 Fed. Reg. 52404 (Aug. 7, 1980), amended 48 Fed. Reg. 33320 (July 21, 1983). Section 280A(c)(4) was added to the Code by the Tax Reduction and Simplification Act of 1977, Pub. L. 95-30, *86 sec. 306(a), 91 Stat. 126, 152. Section 280A(c)(4) was enacted to specifically exempt residences used in providing day care from the "exclusive use" requirement of section 280A(a). The Senate report explains the rationale for the exemption as follows: Under the 1976 Act, to be deductible, any portion of the home used for business purposes must be used exclusively and regularly for the particular trade or business in order to claim expenses as a business deduction. The rule contained in the committee bill recognizes the special character of day care provided in the home, and the infeasibility of requiring that certain rooms (e.g., a kitchen or bathroom) be used exclusively for day care in order to be deductible. * * * * * * It has been pointed out that the exclusive use test will rarely be satisfied in the case of the use of a personal residence to provide certain day care services. Typically, the portion of the residence used to provide these services will also be used for personal purposes. In these cases, it is not practicable to cordon off a portion of the residence to be devoted exclusively to provide day care services. However, where a portion of the residence is *87 used for personal purposes and day care services, the committee believes that this type of business activity in the residence will ordinarily result in incurring incremental expenses attributable to the residence beyond those which have been incurred if the residence had been used solely for personal purposes. * * *
S. Rept. 95-66, supra, 1977-1 C.B. at 474, 499. Thus, the legislative history indicates that Congress enacted section 280A(c)(4) because it recognized the unique nature of home day-care providers. Where a taxpayer operates a day-care business from his/her home, the exclusive test under section 280A(c)(1) will seldom be met, but the taxpayer in operating such a day-care business will incur expenses beyond those incurred had the home been used solely for personal purposes. Therefore, Congress decided that to enforce the "exclusive use" test would be to effectively deny taxpayers a deduction for additional expenses that they legitimately incurred because of their operation of a day-care center in the home. However, while Congress specifically eliminated the "exclusive use" test for day-care operators, it did impose a "regular basis" *88 test. Neither party has cited, nor have we found, cases directly interpreting the "regular basis" test under section 280A(c)(4). A similar "regular basis" test is found under section 280A(c)(1). In commenting upon that "regular basis" test, the Senate report states in pertinent part: the committee's amendment requires that the portion of the residence used for trade or business purposes must be used by the taxpayer on a regular basis in order for the allocable portion of the expenses to be deductible. Expenses attributable to incidental or occasional trade or business use * * * would not be deductible even if that portion of the dwelling unit is used for no other purposes.
S. Rept. 94-938, at 148-149 (1976), 1976-3 C.B. (Vol. 3) 49, 186-187. Consistent with the Senate report, we have found that the regular basis test is met where the taxpayer is able to establish that the business use is continuous, ongoing, or recurring. Jackson v. Commissioner, 76 T.C. 696, 700 (1981); Green v. Commissioner, 78 T.C. 428, 433 (1982), revd. on other grounds 707 F.2d 404 (9th Cir. 1983) *89 (real estate developer used home office on regular basis where on average he was on the phone each evening for 2 hours); Frankel v. Commissioner, 82 T.C. 318, 325 (1984) (editor of the New York Times used home office on regular basis where on average he had one business phone conversation per night). However, where the business use of the area is merely an incidental or occasional business use, expenses incurred for that area are not deductible. Jackson v. Commissioner, supra; Wedemeyer v. Commissioner, T.C. Memo. 1990-324; Christensen v. Commissioner, T.C. Memo. 1984-197, affd. in part and remanded in part 786 F.2d 1382 (9th Cir. 1986). Language in one section of a statute should be interpreted consistently with language of other sections and the statute as a whole. Green v. Commissioner, 707 F.2d 404, 405 (9th Cir. 1983). We conclude that the regular use test of section 280A(c)(4) must be interpreted consistently with the congressional intent to except the "exclusive use" test, but also consistently *90 with prior "regular basis" interpretations. Applying the above rationale, we conclude that Mrs. Uphus used on a regular basis the laundry area, the storage area, and the garage, and that Mrs. Walker used on a regular basis the basement (bathroom, laundry room, and storage room), but not the garage. We find that petitioners' laundry areas were regularly used in the operation of their day-care business. The fact that the children were generally not allowed in the areas is not dispositive of the issue. The issue is whether the area in question is regularly used in the operation of the taxpayer's day-care business, not whether or not the children are present in that area. Neilson v. Commissioner, 94 T.C. at 10 (taxpayers allowed to consider time spent in clean-up and preparation when determining number of hours day care is operated). The uncontroverted evidence is that despite petitioners' general rules, the day-care children did use the laundry areas as play areas. Periodically, each petitioner would collect the children from those areas where they were not supposed to be and bring them back to where they were supposed to be. More importantly, the *91 laundry area was used on nearly a daily basis in the operation of the day-care business. Mrs. Uphus testified that she did as many as two loads of laundry a day in connection with her day-care operation. Mrs. Walker put the number of loads of laundry at two to three per week. Petitioners' obligation was to provide day care for young children in a clean environment. Providing a clean home for day-care children required frequent use of the laundry areas. [7]
Petitioners also used the storage areas on a regular basis. Each petitioner generally cared for seven children during the week. Providing day care for young children required that petitioners maintain a large supply of day-care items. Petitioners needed an area in their homes where these items could *92 be kept. Mrs. Walker stored the majority of her play items and miscellaneous day-care items in the storage area and laundry area. Mrs. Uphus stored her indoor play items in the storage area as well as other day-care items. During the day, petitioners or the day-care children were in and out of the storage areas retrieving and returning these day-care items. We also conclude that Mrs. Uphus used the garage on a regular basis. Mrs. Uphus stored the bulk of her outdoor play items in the garage. Constantly during the day, Mrs. Uphus or the older children were going in and out, retrieving or returning the play items. She also kept other items in the garage that were used in the operation of her day care, such as the lawn-care materials and snowblower. However, based on the evidence, we conclude that Mrs. Walker did not use the garage on a regular basis. Any use of the garage by Mrs. Walker was either merely incidental to her day-care business or predominately personal. Generally, no play items were stored in the garage, nor were other items necessary to the operation of her day care. Mrs. Walker and the day-care children used the garage to access her car four times a week, but *93 that was because she drove her child to preschool. Expenditures that are predominately personal in nature are not transformed into deductible business expenses by incidental or occasional business purpose or benefit. Feldman v. Commissioner, 86 T.C. 458, 465 (1986). The remainder of Mrs. Walker's use of the garage was incidental business use. Once in a while, a day-care child would store a bike in the garage. A few times a week, Mrs. Walker used the garage to access her car so that she could take the day-care children on field trips. Merely walking into the garage to get to the car a few times a week, or even once a day, is not regular use within the meaning of section 280A(c)(4). Finally, we conclude that Mrs. Walker used the basement bathroom on a regular basis. She stated that although she preferred the children use the second-floor bathroom, with 10 children usually in the house, the basement bathroom was used at least once a day. Everyday use of a bathroom is regular use *94 of that room. See Rev. Rul. 92-3, 1992-1 C.B. 141. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The following is a list of the areas by floor and each area's square footage: ↩
First Floor
Square Feet
Basement
Square Feet
Living room
264
Office
154
Kitchen
182
Laundry area
156
Dining area
108
Storage area
195
Porch
108
Bathroom
49
Bathroom
35
Play room
66
Spare bedroom
100
Play area
176
Master bedroom
130
796
927
3. The following is a list of the areas by floors and each area's square footage: ↩
Second Floor
Square Feet
First Floor
Square Feet
Master Bedroom
102
Entry
18.0
Bedroom
108
Foyer
102.0
Bathroom
35
Living room
149.5
Porch
72
Dining room
138.0
Bedroom
120
Kitchen
216.0
Linen closet
20
Stairway
35.5
Bedroom
117
659.0
Hallway
55
Stairway
30
Basement
Square Feet
659
Utility room
324
Storage room
215
Bathroom
25
564
4. The Senate report's method for determining the amount of home expenses that are deductible was incorporated into Rev. Rul. 92-3, 1992-1 C.B. 141. S. Rept. 95-66, 95th Cong., 1st Sess. 1, 91 (1977), 1977-1 C.B. 469, 499. All parties agree that Rev. Rul. 92-3, supra↩, is applicable in these cases.
5. There are 8,760 hours in a year.↩
6. Respondent's notice of deficiency determined that for the space allocation fraction, the denominator (total square footage) was 1,723 for the Uphuses and 1,882 for the Walkers. Respondent omitted the square footage of petitioners' respective garages. Based on the stipulations of fact, the denominator of the space allocation fraction should be 2,251 (1,723 + 528) for the Uphuses and 2,422 (1,882 + 540) for the Walkers.↩
7. We also note that with respect to Mrs. Uphus, the Uphuses kept an extra freezer in the laundry area that was used for storing food for the children. Usually once a day, petitioner entered the area specifically to retrieve food from the freezer for the children.↩